# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs November 12, 2014

## STATE OF TENNESSEE v. TIMOTHY ROY BOZZA

**Appeal from the Criminal Court for Davidson County**
**No. 2010-C-2636     Cheryl Blackburn, Judge**

---

**No. M2013-02537-CCA-R3-CD - Filed January 28, 2015**

---

The Defendant, Timothy Roy Bozza, was convicted of first degree murder by a Davidson County Criminal Court Jury. *See* T.C.A. § 39-13-202 (2014). He was sentenced to life in prison. On appeal, he contends that the evidence is insufficient to support his conviction and that the trial court erred in denying him counsel of his choice. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and CAMILLE R. MCMULLEN, JJ., joined.

David A. Collins (on appeal and at motion for new trial), and Michael Rohling (at trial), Nashville, Tennessee, for the appellant, Timothy Roy Bozza.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Senior Counsel; Victor S. (Torry) Johnson III, District Attorney General; and Tom Thurman, Katrin Miller, and Jan Norman, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

This case relates to the August 29, 2010 fatal shooting of the Defendant's estranged wife, Veronica Bozza, by Coy Cotham. Mr. Cotham was convicted in a separate trial of first degree murder and is serving a sentence of life without parole. *State v. Coy J. Cotham, Jr.*, No. M2012-01150-CCA-R3-CD, 2014 WL 3778613 (Tenn. Crim. App. July 31, 2014), *applic. for perm. app. filed* (Tenn. Oct. 17, 2014). At the Defendant's trial, the State's theory was that the homicide was a contract killing. The Defendant did not contest that Mr. Cotham shot and killed the victim, but he contested his own culpability for the homicide.

The evidence showed that in the summer of 2010, the Defendant and the victim were a few weeks from finalizing their divorce. The parties had reached an agreement for division of assets, but they had been unable to resolve custody issues regarding their nine-year-old son. Although the Defendant and the victim agreed to share custody equally, the parenting plan contained inconsistent provisions about custody. The plan stated that they each had 182.5 days with the child but provided a schedule that allowed the victim substantially more time with the child than the Defendant. The child support amount was based upon the erroneous schedule and required the victim to pay more child support than she would have paid under an equal custody arrangement. The Defendant was concerned that the victim would move out of the state and that the parenting plan with the erroneous schedule might provide a basis for the victim's moving without the court's permission. The victim had expressed her desire to remain in Nashville for the child's benefit and, in an effort to alleviate the Defendant's concerns that she might relocate, had offered to pay the transportation costs and the Defendant's attorney's fees if she attempted to relocate. Nevertheless, the victim and the Defendant had reached an impasse in their negotiations, and the victim wanted a court hearing to resolve the matter.

While the divorce was pending, the Defendant and the victim were both under a court order to maintain a $350,000 life insurance policy with the other spouse as the beneficiary. The victim had life insurance of $550,000 that designated the Defendant as the beneficiary. The victim, a music video producer, was financially successful, but the Defendant, a construction contractor, was having economic difficulties.

Mr. Cotham had known the victim and the Defendant for several years. In recent years, Mr. Cotham had lived away from Nashville, but in April 2010, he contacted the Defendant and began doing construction work for him. The Defendant and Mr. Cotham also socialized together. At the time, the Defendant lived with his mother, and Mr. Cotham alternately stayed with multiple women.

On August 29, 2010, the victim and the child attended Mass at St. Edward's Catholic Church. A priest testified that he spoke with the victim after the Mass around 11:35 or 11:40 a.m. The Defendant waited in a parking lot outside the church to exchange custody of the child, as was the usual procedure on Sundays. The Defendant and the child left, and the victim returned to her house. Mr. Cotham was waiting nearby as she left the church, and he followed her home. The evidence showed that Mr. Cotham and the victim struggled inside the house, and he shot her at least four times. A medical examiner testified that the victim had two gunshot wounds to the head, both of which could have been fatal, a gunshot wound to the right shoulder, a gunshot wound to the mid-back, and a grazing wound to the left back. She also had abrasions.

Brian Robinson, the victim's boyfriend, testified that he spoke with the victim by telephone about 11:30 or 11:45 a.m. Cell phone records showed he and the victim spoke at 11:51 a.m. He traveled from a friend's house to the victim's house, arriving around 12:25 or 12:30 p.m. He found the fatally injured victim inside. He called 9-1-1 at 12:30 p.m. Location data from Mr. Robinson's cell phone corroborated his statement to the police that he had not been near the victim's home at the time she was killed. He testified that he did not see an iPad, the victim's iPhone, or a laptop computer at the house. He identified a blue cloth that was recovered from Mr. Cotham's SUV as being consistent with a cloth used for cleaning computer screens at the victim's house.

Police recovered four nine-millimeter projectiles and one nine-millimeter shell casing from the scene. Forensic evidence established that the shell casing from the scene had been fired from the same weapon as other casings that had been fired from a weapon Jeffrey Walters had reported as stolen before the victim's homicide. Mr. Walters was married to but separated from Jennifer Addington, who dated Mr. Cotham.

Metropolitan Police Department Detectives Andrew Injaychock and Johnny Crumby testified that they responded to the scene and then went to the Defendant's residence in Greenbrier to notify him of the victim's death. Detective Injaychock said they told the Defendant an incident occurred at the victim's house that they were investigating as a homicide but did not tell him the cause of death was by gunshot. The Defendant agreed to go to the Hermitage Precinct to be interviewed. He wanted to have his uncle accompany him, and the detectives followed him in a separate vehicle from his house to his uncle's house and to the precinct. Detective Injaychock testified that the Defendant was on a cell phone almost the entire time they were in transit.

The Defendant's interview with Detectives Injaychock and Crumby on the afternoon of the homicide was the first in a series of interviews in which he gradually admitted greater culpability. In the first interview, he denied any involvement in or knowledge of the victim's homicide. He said he did not send anyone to hurt or scare her. The detectives asked to see the Defendant's cell phone, and the Defendant agreed and said his uncle had it. They obtained the phone from the uncle, and when the Defendant looked at the phone, he said someone had erased its history. He asked the uncle if he erased it. The uncle professed his inability to operate modern technology. The Defendant was able to provide an alibi for the time of the homicide, and receipts and security footage from two retail establishments corroborated his account.

Detective Injaychock testified that after the interview, he and Detective Crumby went with the Defendant to the victim's house. He said that the blood and the evidence of an altercation had not been cleaned up. He did not recall the Defendant's having a physical reaction to the scene.

During the August 29 interview, Detective Crumby falsely told the Defendant that one of the victim's neighbors had a security camera. James Nehs, one of the victim's neighbors, testified that a few days after the homicide, the Defendant, whom he had met once, walked up behind him when he was mowing his lawn. He said that the Defendant inquired what the police were saying, said the police were lying to the Defendant, and stated the police told him a neighbor had a security camera on a porch. Mr. Nehs said the Defendant asked if he had a security camera and told Mr. Nehs to let him know if he heard or saw anything.

Detective Crumby testified that the police obtained cell phone records for the Defendant, the victim, and Mr. Robinson. After reviewing the Defendant's records and noticing several calls with Mr. Cotham, they obtained Mr. Cotham's records. Detective Crumby contacted Mr. Cotham, who did not want to be interviewed at the precinct, but agreed to meet Detectives Crumby and Injaychock in a parking lot and give a recorded statement on August 30, the day after the homicide. Mr. Cotham told the detectives that he called the Defendant on the previous morning to discuss their weekend and the Defendant's "new girl." He said he called the Defendant a second time and talked until the Defendant had his son with him. He said that neither of them typically talked on the phone during visitation with their children. He said he talked to the Defendant a couple of times and agreed with the Defendant's claim they last talked around noon or 12:30 p.m. on August 29. He said he had been at a girlfriend's house when he spoke with the Defendant the second time. He said that he sent the Defendant a text message on the morning of August 30 that he would be late for work and that the Defendant responded that there would be no work because of what happened to the victim. Mr. Cotham claimed this was when he found out about the victim's death. He said he called the Defendant after receiving the text message.

When confronted by the detectives with information from his cell phone records indicating that he had not been in the locations he had identified, that his cell phone had been in the victim's neighborhood when he called the Defendant at 12:20 p.m., and that the victim's iPhone and his cell phone had been in identical locations at various times, Mr. Cotham denied involvement. The detectives advised Mr. Cotham that they were seizing his cell phone and his SUV. Items recovered from the SUV included a black duffel bag, the contents of which included a pair of used latex gloves and a box of latex gloves, Mr. Cotham's Verizon cell phone bill, and a Cricket cell phone; a red collapsible cooler containing a black hat and a black police or military tactical sleeve; and a blue towel. A

police department civilian employee testified that the tactical sleeve could be used to conceal a person's identity.

DNA evidence was collected from items in the SUV, and DNA and blood evidence were collected from Mr. Cotham, the Defendant, Mr. Robinson, and the victim. Test results revealed the following: DNA on the blue towel was consistent with a mixture from three individuals. One test excluded the Defendant and Mr. Robinson but not the victim and Mr. Cotham. Testing at another facility determined that Mr. Cotham was the major contributor but could not exclude the victim and Mr. Robinson as minor contributors. DNA on the cooler was consistent with a mixture from at least two people. Mr. Robinson, the Defendant, and the victim were excluded, but Mr. Cotham could not be excluded. DNA on the tactical sleeve was consistent with a mixture from at least three people. Mr. Cotham was the major contributor.

After talking with Mr. Cotham, the police interviewed Jennifer Addington, the person with whom Mr. Cotham claimed to have been at the time of the victim's homicide. Detective Crumby said she corroborated Mr. Cotham's alibi but was not very cooperative. He said she contacted the police on September 11, 2010, stating that she was afraid of Mr. Cotham and that she wanted to tell the truth. Detective Crumby testified that Ms. Addington stated that Mr. Cotham had taken her to dinner on August 29 and that on the way to the restaurant, he stopped in a parking lot by a Catholic school, which Detective Crumby said was the location the victim and the Defendant exchanged custody of their son. Ms. Addington agreed to cooperate with the police and attempted to lure Mr. Cotham from Kentucky to Nashville after his indictment. In one of her telephone calls with Mr. Cotham, he mentioned a nine-millimeter gun. According to other proof, details of the weapon had not been made public by the authorities. Despite Ms. Addington's efforts to convince Mr. Cotham to return to Nashville, he ultimately was arrested in Kentucky.

Ms. Addington testified that she dated Mr. Cotham, gave him money, and allowed him to drive her minivan. She said that on August 29, 2010, she had worked the previous night in Huntsville, Alabama, and that she returned to Nashville around 9:30 a.m. She showered and went to bed. She woke to find Mr. Cotham leaning over her. She said she slept with a handbag containing her van's key and her money in the bed because she had roommates. She thought Mr. Cotham was leaning over her to kiss her to wake her, but she said a person would also have to lean over her in order to get her van's key. She said it was "very possible" Mr. Cotham was taking her key, but she did not know if he drove her van while she slept that day. She thought that she asked Mr. Cotham the time when he leaned over her and that he said "somewhere around ten something." She said that she went back to sleep, that he woke her mid-afternoon, and that they went to TGI Friday's for an early dinner, stopping at the church parking lot. She said Mr. Cotham stated he did not know why they went that

way, turned around, backed up, and went to the restaurant. Ms. Addington said that when she was in the Defendant's SUV that day, she saw a thin, white cell phone fall off the console and she put it back. She had not seen it previously and did not see it again. She said Mr. Cotham had a black Android cell phone, which was consistent with other witnesses' testimony. Ms. Addington said that Mr. Cotham left the restaurant for more than five but less than thirty minutes during their meal.

Ms. Addington testified that at Mr. Cotham's urging, she had taken a nine-millimeter handgun in a maroon lunchbox cooler from her then-husband on July 17 or 18, 2010. She said Mr. Cotham told her that she should take the gun to keep her husband from using the gun on her. She said Mr. Cotham did not ask her to give him the gun. She placed the cooler containing the gun in the back of her van, and she noticed it was missing on July 27. She said Mr. Cotham unloaded her groceries from the back of the van on multiple occasions.

Ms. Addington testified that after meeting with the detective, Mr. Cotham asked her to search the internet for "dirt" on the detectives and for information about their families. She said he told her to clear her computer after performing the searches. She said Mr. Cotham told her that he and the Defendant were going to Barbados and invited her to join them. She said that after the homicide, she initially provided Mr. Cotham's alibi, but he later threatened her, and she was afraid of him. A search warrant was executed on her house, and she was named in the warrant as an accessory after the fact. She learned that her then-husband had been interviewed by the police. She decided to cooperate with the authorities to assure her safety.

Jeffrey Walters, Ms. Addington's former husband, testified that he owned a Hi-Point nine-millimeter handgun that disappeared around July 10, 2010. He suspected Ms. Addington had taken it, and he reported it stolen. He did not know any reason Ms. Addington would fear his using the gun on her. He had fired the weapon on his property in Lawrence County, and he helped police look for and recover shell casings there.

Jonathan Schmahl, a former neighbor of Mr. Cotham's, testified that he met the Defendant through Mr. Cotham and did some remodeling work for the Defendant. Mr. Schmahl said Mr. Cotham asked him for assistance obtaining a gun in July 2010, which Mr. Cotham said he wanted for personal protection. Other evidence established that Mr. Cotham was a convicted felon and could not legally purchase or possess a firearm. Mr. Schmahl said Mr. Cotham liked to boast and display money and answered questions indirectly. He told Mr. Cotham he would not obtain a weapon for him. He said Mr. Cotham later came to his apartment with a Hi-Point nine-millimeter handgun in a maroon lunch bag. He said the gun looked like the gun depicted in a photograph that was identified by another witness as a photograph recovered from Mr. Cotham's cell phone. He said Mr. Cotham asked him to

clean the gun and asked for his opinion on its value. He said Mr. Cotham claimed to have purchased the gun for $350, which Mr. Schmahl told him was too much. Mr. Schmahl was an Army veteran and was familiar with guns from having been around them all his life. Mr. Schmal said he last saw Mr. Cotham one or two days after Mr. Cotham showed him the gun. He said Mr. Cotham was moving out of the apartment complex and wanted help moving. He later learned Mr. Cotham had been evicted. He said Mr. Cotham called him on August 29, 2010 at 12:28. He said Mr. Cotham stated he was running errands and had seen him. He said that when he received the call, he was on Old Hickory Boulevard near Andrew Jackson Parkway headed toward Madison.

Michael Chad Wilson testified that he knew Mr. Cotham from Mr. Wilson's Game Trader business. He said Mr. Cotham called him on August 29, 2010, at 2:46 p.m. and asked how to take a battery out of an iPhone. He said the call lasted forty-four seconds. He said Mr. Cotham was proud of his cell phone and liked to show it off because of an app he had on it. He said Mr. Cotham referred to himself as "the big man" and often claimed to have a lot of money. He said Mr. Cotham claimed he "flipped properties" and made "good money" working with the Defendant.

Judge Phillip Robinson testified that he had previously been in private practice and that he represented the victim in her divorce proceedings from the Defendant. Before his representation began, the Defendant and the victim had agreed on a marital dissolution agreement. Although a parenting plan existed, it contained inconsistencies regarding equal time with the child and an incorrect amount of child support, which the parties were trying to resolve. He said there had been a hearing about the issues, and he thought the Defendant and the Defendant's attorney were upset with the outcome. He and the Defendant's attorney exchanged letters but were unable to resolve the issues.

Judge Robinson testified that the victim notified him of two communications from the Defendant which she perceived as threats. He said he received an email dated Sunday, March 28, 2010, in which the victim stated she and the Defendant had a heated discussion during their custody exchange about parenting time. She said the Defendant looked at her, said, "Be careful, it's coming," and pointed at her with his right index finger. He said this was before the hearing. He said that after the hearing, the victim reported that she and the Defendant had a disagreement about his questioning her about the child's babysitter. She told Judge Robinson she tried to explain to the Defendant how she perceived the Defendant's inquiries, and the Defendant said he could not speak to her and accused her of not focusing on the child. The victim told Judge Robinson the Defendant said it would take "a simple phone call" to "end the nonsense," that she asked the Defendant if he was threatening her, that he continued yelling, and that she hung up on him.

John Russell, a financial planner, testified that he sold life insurance policies to the victim and the Defendant in 2005. He learned of the victim's homicide on August 30, 2010, and notified the insurance company. He said that according to the insurance company's records, the Defendant filed a claim on September 1. He said that at the victim's funeral on September 5, the Defendant approached him and said he was glad Mr. Russell had come because he did not know how to contact him and needed to speak with him about the insurance. He said he gave the Defendant his business card but never heard from him. He said the Defendant allowed his own policy to lapse at times beginning in December 2009.

Tennessee Bureau of Investigation (TBI) Special Agent Steve Scott testified as an expert in firearms identification and analysis. He examined four projectiles and a shell casing recovered from the scene and shell casings previously identified as having been recovered from Mr. Walters's Lawrence County property. He said the slugs were nine millimeter, were made of an alloy of copper and steel, and had "nine left rifling." He said a copper and steel alloy was unusual in ammunition manufactured in United States and was characteristic of Chinese and Russian ammunition. He said Hi-Point was the only weapons manufacturer of which he was aware that made guns with nine left rifling. When shown the photograph of a gun that had been previously identified as a photograph from Mr. Cotham's cell phone, he said the gun appeared to be a Hi-Point weapon and could be consistent with the weapon that fired the bullets at the crime scene. He said that the photograph depicted a magazine inside the gun and that the magazine contained a greenish cartridge, which was consistent with the same brand of Russian-manufactured ammunition recovered at the scene. He said that in his opinion, the same weapon fired the shell casing from the crime scene and the shell casings recovered in Lawrence County.

TBI Special Agent Russell Davis, an expert in gunshot residue testing, testified that the blue towel recovered from Mr. Cotham's SUV contained gunshot residue containing tin and zirconium, which indicated it might have come from ammunition that was not American made. He said this was the only time he had found zirconium in thirty years of testing. He tested the interior of a fired cartridge recovered from the scene and determined that it also contained zirconium.

TBI Special Agent Joel Wade, an expert in computer and mobile device forensics, testified that he verified the location of Wi-Fi networks using data recovered from Mr. Cotham's cell phone. He said the range of a Wi-Fi network was about 300 yards but varied if obstructions and radio frequencies were present. He verified the location of a Wi-Fi network accessed by Mr. Cotham's cell phone on August 26, 2010, at 6:13 a.m. as being near the victim's neighborhood pool parking lot. He verified the location of a Wi-Fi network accessed on August 29, 2010 at 11:54 a.m. as a medical facility near St. Edward's Catholic Church.

Metropolitan Police Department Detective Andrew Vallee testified that he analyzed technical data from cell phone records and mobile location data in this case, and he exhibited a visual presentation of his findings. He said that on August 26, 2010, at 6:20 or 6:30 a.m., Mr. Cotham called the Defendant. He said the Defendant and Mr. Cotham spoke by cell phone thirteen times on August 29, 2010: seven times before the homicide and six afterward. Regarding Mr. Cotham's calls, he said Mr. Cotham called the Defendant at 10:46 a.m., with the call being routed through an antenna near Ms. Addington's house. He said Mr. Cotham called the Defendant at 11:14 a.m. via an antenna near Interstate 40 on Briley Parkway. From 11:20 to 11:43 a.m., five calls were placed between the Defendant and Mr. Cotham via the antenna closest to St. Edward's Catholic Church. He said the calls were short or went to voice mail. He said no cell phone activity involving Mr. Cotham's device occurred between 11:43 a.m. and 12:20 p.m. At 12:20 p.m., Mr. Cotham called the Defendant via an antenna near the homicide scene, with the call transferring to another antenna nearby. He said the call lasted ten seconds. He said Mr. Cotham called the Defendant again at 12:22 p.m. and that they talked for 102 seconds. He said Mr. Cotham called Mr. Schmahl at 12:28 p.m. via an antenna near Interstates 24 and 40. He said that Mr. Cotham called the Defendant at 12:51 p.m. via an antenna near Ms. Addington's house. Call location information showed Mr. Cotham near Hickory Hollow Mall and TGI Friday's during the afternoon and another call to the Defendant at 3:23 p.m.

Detective Vallee testified that Ms. Addington's cell phone data showed she had traveled from Alabama on the morning of August 29, 2010. Her location data showed connections near her home until her cell phone connected near TGI Friday's.

Regarding the victim's cell phone and location data, Detective Vallee testified that the last call made before her homicide was at 12:07 p.m. He said a call was received at 1:48 p.m. from the Defendant's cell phone via an antenna near Ms. Addington's house. He said no activity occurred between August 29, 2010, at 7:40 p.m. and August 31 at 10:53 a.m., when her phone transmitted data via an antenna near the Waste Management Transfer Station in Antioch. He said the victim's cell phone transmitted data again at 1:44 p.m. from the Waste Management West Camden Landfill in Benton County. The parties stipulated that waste from the Waste Management Transfer Station in Antioch was transferred to either the Benton County landfill or a landfill in Kentucky.

Metropolitan Police Department Detective Chad Gish testified regarding his examination of the Defendant's and Mr. Cotham's cell phones. He said that Mr. Cotham was listed in the Defendant's contact list. He said that although Mr. Cotham's cell phone contained text messages to and from the Defendant before and after the victim's death, the Defendant's cell phone did not contain any text messages or call history. He said Mr. Cotham's cell phone contained photographs of the Defendant and a photograph of a gun.

The Defendant's cell phone contained an August 24, 2010 photograph of Mr. Cotham. He said a September 17, 2010 email from Brenda Pittman, who was identified by other testimony as one of Mr. Cotham's girlfriends, contained information about countries with which the United States did not have extradition treaties, obtaining a passport, the waiting period for a passport, and the country of Barbados. Mr. Cotham's cell phone contained text messages between himself and Ms. Pittman, including one on August 29, 2010, at 8:57 p.m. in which she said that she was happy for him and that it was great when a plan came together.

Detective Injaychock testified that Mr. Cotham's Facebook postings included a statement on August 19, 2010, that he was trying to close some business deals in order to vacation in September and October in Barbados. On August 29 at 11:15 p.m., he stated in a posting that he had just closed a big deal involving renovation of condominiums, which meant "a sweet payday for the big man."

After he was arrested, the Defendant gave three recorded interviews. His attorney was present for the interviews. In the first interview, on September 28, 2010, the Defendant initially denied any involvement in the homicide or prior knowledge of Mr. Cotham's actions. After taking a break to consult with his attorney, the Defendant denied he had hired Mr. Cotham to kill the victim but said they had conversations that were "still kind of suggesting." He said Mr. Cotham had difficulties with his child's mother's husband, who had custody of Mr. Cotham's child due to the mother's drug addition. The Defendant said he suggested in jest that they do a "crisscross" killing for each other, with him killing a man for Mr. Cotham and Mr. Cotham killing the victim. He said the idea was based on the movie "Throw Momma from the Train." The conversation took place on the day he had been in divorce court about the unresolved custody issues. He acknowledged that Mr. Cotham followed up on the conversation by following the victim twice. He said Mr. Cotham claimed he had committed two previous murders.

The Defendant said Mr. Cotham knew where to find the victim on August 29 because the Defendant had previously pointed out the church and the school. He said he told Mr. Cotham that morning he was going to pick up the child. He claimed he never saw Mr. Cotham when he was picking up the child. He said, though, that he had seen Mr. Cotham earlier in the morning, that they chatted about Mr. Cotham's girlfriends, and that Mr. Cotham was driving Ms. Addington's van. He eventually admitted that when he saw Mr. Cotham on August 29, he "had a feeling" about what was about to happen but also thought Mr. Cotham would not follow through because Mr. Cotham had followed the victim but not harmed her on previous occasions. He denied that he needed to know when Mr. Cotham was going to commit the crime because he needed to establish an alibi. He said that when Mr. Cotham told him the victim tried to run, he told Mr. Cotham he did not want to know anything about

the shooting. He later said he told Mr. Cotham "in the beginning" he could not know anything. He said, "[I]f I don't know something, I can't actually lie about it."

The Defendant told the police that about a week before the September 28 interview, Mr. Cotham came to his house and asked for $35,000. He said he told Mr. Cotham he would not receive any money while unresolved questions about the victim's death existed. He said first that he and Mr. Cotham did not talk about money until after the crime, although he later said he did not recall any such conversation beforehand. Later in the interview, he said that although part of him was angry with Mr. Cotham, he might have given him $35,000 if they had "gotten off." He denied that the amount Mr. Cotham wanted was $35,000 because it was 10% of the $350,000 required life insurance policy. He said Mr. Cotham did not threaten him after asking for money. He said, though, he had not told Detective Crumby previously what he knew because he was afraid of Mr. Cotham and his friends.

Regarding the victim, the Defendant stated that she meant everything to him and that he loved her but that nothing he did was good enough for her. He said when he caught her having an affair, she told him that the courts were on her side, that he would receive nothing, and that he would never see their son. He said, though, they worked through the issues. He said he had wanted something to happen to the victim in order for him to be with his son, but he did not want someone to kill her. Referring to an alleged marital impropriety earlier in the marriage, he said that if he had been able to kill someone, he would have killed her the second time he discovered she was having an affair. He said that the victim had prolonged the divorce but that he thought they were at the point of resolving it. He said, though, that the victim lied to him even when they were getting along. He said he could never "get past it." He said he had a new girlfriend. He also said he wanted to move on with his life like the victim.

The Defendant denied that before the crime, he and Mr. Cotham had discussed going to Barbados. He had been to Barbados recently, and he said he told Mr. Cotham he would like to return.

The Defendant gave a second post-arrest statement on November 2, 2010. He acknowledged the conversation he had with Mr. Cotham about a crisscross killing but said it was "more kind of in jest." When asked if the agreement about a crisscross killing was dropped, he said, "Yes sir. I mean it was almost an immediate thing." He said Mr. Cotham mentioned it again a couple of days later and offered him $10,000 to kill a man. He said he told Mr. Cotham he could not do it. He said Mr. Cotham did not ask how much the Defendant would pay him to kill the victim. He said he told Mr. Cotham that he wished the victim would get hit by a bus, run over by a drunk driver, or would move to California. He

said Mr. Cotham later said he had followed the victim. He said he did not tell Mr. Cotham to stop or ask him why he had done it.

The Defendant said he and Mr. Cotham were working on a business deal involving purchasing and reselling sports jerseys but that they did not otherwise discuss the Defendant's finances or divorce. He told Mr. Cotham that he and the victim were about three weeks away from signing the final divorce documents. Mr. Cotham knew the Defendant was talking to another woman about marriage.

The Defendant said that after the crime, Mr. Cotham stated that he had talked to Ms. Addington and that everyone who lived at her house was going to say Mr. Cotham had been there on the day of the homicide. He denied he and Mr. Cotham were going to Barbados together to get away. The Defendant said he had been to Barbados recently and had invited Mr. Cotham to go the next time he went. The Defendant said his next trip was to have been to Florida with his son in October 2010. The Defendant said that after the homicide, Mr. Cotham stated that he had been acquitted of two murders and said unfavorable things about some of the detectives involved in the present case. He said that Mr. Cotham was the "big ecstasy king in town," that the police had been unable to "bust" Mr. Cotham on drug charges, and that Mr. Cotham was full of "pomp and praise" about it.

The Defendant denied that he and Mr. Cotham had a plan for posting bond. He said Mr. Cotham had written him to ask if he would help him make bond if the Defendant were released. He said no resolution was reached about Mr. Cotham's request for $35,000. Regarding the victim's life insurance proceeds, he said he called the insurance company quickly because his attorney told him funds might be available for the victim's funeral expenses.

The Defendant gave a third post-arrest statement on November 16, 2010. The district attorney stated at the beginning of the recording that defense counsel had called him and said the Defendant wanted to "set things straight" because he had not been completely truthful in the last statement, which the Defendant acknowledged.

The Defendant stated that the idea for the homicide began when he and Mr. Cotham both had a bad day and discussed the crisscross arrangement from the movie. He said Mr. Cotham talked to him about it a couple of days later and was more serious. He told Mr. Cotham he could not kill anyone. He said Mr. Cotham offered him $10,000 to kill the man Mr. Cotham wanted dead. He said he responded that $10,000 sounded good to him and that he would give Mr. Cotham $10,000. He said that he and the victim continued to have disagreements and that Mr. Cotham wanted to establish a routine of following her. He said that he did not disagree with Mr. Cotham about following the victim and that as Mr. Cotham

-12-

became more serious, he "just kind of left the idea there in place." He said Mr. Cotham boasted about having "beat" other murder and drug charges and about having the best attorney in town. He said, "I'm not gonna [sic] say no, I'm not gonna [sic] say yes and just see where he goes with it."

The Defendant stated that Mr. Cotham followed the victim a couple of times, but nothing happened. He said that he gave Mr. Cotham information about one of the victim's worksites and that Mr. Cotham followed the victim to another worksite. He described an incident in which Mr. Cotham watched the victim while Mr. Cotham lay in the grass in the dark outside the victim's house. He said he knew of two incidents Mr. Cotham followed the victim. He said Mr. Cotham discussed that he was waiting for the right time. When asked if he knew Mr. Cotham was "on go" at that time, the Defendant responded that he did. He said everything happened quickly within a couple of weeks.

Regarding the day of the homicide, the Defendant stated that he and Mr. Cotham had a couple of telephone conversations. He said he met Mr. Cotham at a gas station near the church. He said that in a telephone conversation, Mr. Cotham said he was nearby and that he could see Mr. Cotham across the street. He said he and the victim exchanged the child. A short time later, he received the call telling him "it was done." He said that at one point, Mr. Cotham told him to stop calling the victim's cell phone because Mr. Cotham had it. He asked Mr. Cotham why he took the cell phone and told him it had GPS. The Defendant said he told Mr. Cotham to stop talking about the homicide and to call him that night or the next morning about work. He said he never saw the gun.

The Defendant stated that he avoided Mr. Cotham's calls for a while and was not around him for three or four days after the homicide but that eventually, he had to continue meeting with Mr. Cotham at night to maintain their routine. He said he did not want to "disappear" from people who knew him. He said that Mr. Cotham was concerned his cell phone was being monitored and that although they did not have code words, they said non-specific things. He said Mr. Cotham came to his house one and one-half to two weeks after the homicide and asked for $35,000. He said Mr. Cotham stated that he was going to get a new identity from someone in Atlanta and go away. He said Mr. Cotham wanted $35,000 because the victim fought with him. He said Mr. Cotham did not know about the victim's life insurance but was aware of a loan for which the Defendant had applied. He said he would not have told Mr. Cotham about the victim's life insurance because if Mr. Cotham had been aware, he probably would have asked for a larger amount.

The Defendant stated that Mr. Cotham said the victim "[p]ut up a fight." The Defendant told Mr. Cotham not to talk about the homicide. He said he did not want to know and have to lie about it. He said that at some point, Mr. Cotham asked him to find Brenda Pittman's telephone number through Facebook.

The Defendant stated that he and Mr. Cotham were developing an adult website because it was a lucrative field. He said that he was to provide the money for the endeavor from the proceeds of the loan for which he applied and that Mr. Cotham was "getting the bodies."

The Defendant stated that Mr. Cotham was a loyal friend but that if Mr. Cotham did not like a person, the person should not only cross the street to avoid Mr. Cotham but go to another part of the city. He said he had never encountered many people Mr. Cotham did not like or with whom Mr. Cotham did not get along.

Near the end of the statement, the Defendant said he had prayed for the strength to tell the truth and had a dream that inspired him to speak with the authorities. He apologized for taking so much time to tell the truth.

Laura Looch, a former Davidson County Sheriff's Department correctional officer, testified that she worked briefly at the facility where the Defendant was incarcerated. She said he was her "rock man," which she said was an inmate who cleaned the halls and helped "serve." She said they had three or four conversations and sometimes talked about the Defendant's son. Ms. Looch said that on February 9, 2011, the Defendant came to her and appeared to want to talk. He began talking about the crime and told her he had said something to Mr. Cotham that had been misunderstood. She said his statement was unusual because the Defendant would not have known that she was aware of the nature of his charge. She said the Defendant stated, "[Y]ou never know what you will do when someone tried to take that one last thing you love from you." She said the Defendant stated that he had been going to Bible classes or having clergy visits for three months. She said he stated, "I spent three months thinking that I did what I did out of love, but now I know it was just pride and anger."

A court clerk testified that the Defendant and Mr. Cotham both completed Uniform Affidavits of Indigency after their arrests. She said that the Defendant's affidavit "pretty much" showed no income or assets and that Mr. Cotham's affidavit showed no income or assets. She acknowledged that the Defendant may have been in custody for some time before he completed the affidavit.

The Defendant did not testify. After receiving the proof, the jury found the Defendant guilty of first degree murder. This appeal followed.

## I

The Defendant contends that the evidence is insufficient to support his conviction. He argues that no forensic evidence linked him to the crime scene, that his statements to the police were admissions rather than confessions, and that the evidence does not contain sufficient corroboration of Mr. Cotham's statements.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given to the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see also State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Relevant to this case, first degree murder is the unlawful, intentional, and premeditated killing of another. T.C.A. §§ 39-13-201 (2014), 39-13-202(a)(1) (2014). In the context of first degree murder, intent is shown if the defendant has the conscious objective or desire to cause the victim's death. *State v. Page*, 81 S.W.3d 781, 790-91 (Tenn. Crim. App. 2002); T.C.A. § 39-11-106(a)(18) (2010) (amended 2011, 2014) (defining intentional as the "conscious objective or desire to engage in the conduct or cause the result"). A premeditated act is one which is

> done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine

-15-

> whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* § 39-13-202(d). The question of whether a defendant acted with premeditation is a question of fact for the jury to be determined from all of the circumstances surrounding the killing. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). Proof of premeditation may be shown by direct or circumstantial evidence. *State v. Brown*, 836 S.W.2d 530, 541 (Tenn. 1992). As relevant to this appeal, a defendant is criminally responsible for the conduct of another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" T.C.A. § 39-11-402(2) (2014).

In the light most favorable to the State, the evidence shows that the Defendant and the victim had a history of disagreements about the final resolution of their divorce. The Defendant acknowledged being angry with the victim and not being able to move past it. On two occasions, he made statements to the victim that she perceived as threats, telling her to "be careful, it's coming" and stating he could end the nonsense with a telephone call.

The evidence also shows that the Defendant and Mr. Cotham discussed a crisscross murder scenario in which Mr. Cotham would kill the victim for the Defendant and the Defendant would kill a man for Mr. Cotham. According to the Defendant's statements, he was not serious initially. He said that when he had a later conversation in which Mr. Cotham offered him $10,000 to kill the man, the Defendant declined but said that $10,000 sounded good and that he would give the money to Mr. Cotham. The Defendant admitted that he told Mr. Cotham one of the victim's worksites, that he knew Mr. Cotham followed the victim on multiple occasions, that he knew Mr. Cotham was waiting for the right opportunity, that he waited to see what Mr. Cotham would do rather than objecting, and that he knew what was likely to happen on August 29. The cell phone records showed numerous calls between Mr. Cotham and the Defendant on the date of the homicide. The cell phone location data showed Mr. Cotham near the victim's house around the time of the homicide and Mr. Cotham's and the victim's cell phones in the same locations after the crime. In addition, after the homicide, the Defendant was untruthful with the authorities and continued associating with Mr. Cotham in order to avoid arousing suspicion.

According to Ms. Addington's testimony, the Defendant and Mr. Cotham were planning to go to Barbados soon, and information from a computer belonging to Ms. Pittman's employer showed research on obtaining a passport and on countries without extradition treaties, including Barbados. Mr. Cotham's Facebook postings indicated that on August 19, he was working to close a couple of business deals that would allow him to vacation in Barbados in September and October and that on August 29 at 11:15 p.m., less

than twelve hours after the homicide, he had just closed a deal and was expecting a "sweet payday for the big man." On August 19, Ms. Pittman sent Mr. Cotham an email with attachments pertinent to obtaining a passport, the waiting period for a passport, and Barbados. She sent him information about the lack of an extradition treaty between the United States and Barbados on September 17.

Ms. Addington testified that she took Mr. Walters's nine-millimeter handgun and kept it in a maroon cooler in her van. A cooler matching the description was recovered from Mr. Cotham's SUV. Forensic evidence established that shell casings recovered from Mr. Walters's farm and the crime scene were fired from the same nine-millimeter weapon.

The Defendant also had a financial motive for the victim's death. He was the beneficiary of her $550,000 life insurance policy and filed an insurance claim three days after her death. The victim would have been permitted to designate a different beneficiary when the divorce became final. The Defendant told the police the divorce would have been final about three weeks after the date of the victim's death. The Defendant was having financial difficulties and had applied for a large loan. He planned to use the loan proceeds to finance business endeavors with Mr. Cotham involving purchasing and selling sports jerseys and starting an adult website.

According to Ms. Looch's testimony, the Defendant approached her at the jail in February 2011 and said he had been attending Bible classes or having clergy visits for three months. He told her Mr. Cotham misunderstood something he said and stated, "[Y]ou never know what you will do when someone tried to take that one last thing you love from you." He also stated, "I spent three months thinking that I did what I did out of love, but now I know it was just pride and anger."

The Defendant asserts that no physical evidence connects him to the crime scene. Although his assertion is factually correct, it is not determinative because the State's theory did not require proof that the Defendant participated in the actual homicide. The evidence shows, and the Defendant did not contest at the trial, that Mr. Cotham killed the victim. We conclude upon review of the facts that a rational trier of fact could find beyond a reasonable doubt that the Defendant was criminally responsible for Mr. Cotham's unlawful, premeditated, and intentional killing of the victim.

The Defendant also argues that the evidence is insufficient because the jury relied on the uncorroborated statements of his accomplice, Mr. Cotham. He has neither identified Mr. Cotham's statements that he contends were the basis of his conviction, nor has he explained his argument. We note that the evidence includes Mr. Cotham's August 30, 2010 police interview in which he acknowledged talking to the Defendant by telephone on the date of the

homicide but denied any responsibility for the crime. It also includes Mr. Cotham's statements in his Facebook posting ten days before the homicide that he was working on a business deal that would allow him to vacation in Barbados in September and October, as well as his Facebook posting on the night of the crime that he had closed a couple of deals that would mean a "sweet paycheck for the big man."

An accomplice is someone who "knowingly, voluntarily, and with common intent unite[s] with the principal offender in the commission of the crime." *Letner v. State*, 512 S.W.2d 643, 647 (Tenn. Crim. App. 1974). Whether a defendant is an accomplice is a question of fact for a jury, unless a defendant confesses. *Hicks v. State*, 149 S.W. 1055, 1056 (Tenn. 1912). Our supreme court has stated that "a conviction may not be based solely upon the uncorroborated testimony of an accomplice." *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001); *see also State v. Henry Lee Jones*, — S.W.3d —, No. W2009-01655-SC-DDT-DD, 2014 WL 4748118, at *18 (Tenn. Sept. 25, 2014); *State v. Collier*, 411 S.W.3d 886, 894 (Tenn. 2013). This means "there must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it[.]" *State v. Gaylor*, 862 S.W.2d 546, 552 (Tenn. Crim. App. 1992) (citations omitted); *see State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994) (citing *Gaylor*); *see also State v. Fowler*, 373 S.W.2d 460, 463 (Tenn. 1963). The corroborative evidence may be circumstantial or direct, and it is not necessary that it be adequate, standing alone, to support a conviction. *Bigbee*, 885 S.W.2d at 803 (quoting *Gaylor*, 862 S.W.2d at 552).

We do not share the Defendant's concern that the conviction was based solely upon Mr. Cotham's uncorroborated statements. The Defendant overlooks the corroborating proof provided by his own inculpatory statements, particularly his November 16, 2010 statement to the police and his February 9, 2011 statement to Ms. Looch. He also overlooks the cell phone evidence showing his communications with Mr. Cotham before and after the homicide and his and Mr. Cotham's presence near the victim's church before the homicide.

Finally, the Defendant argues that his statements were admissions of the existence of facts that tend to establish his guilt when considered with other facts but did not amount to a confession. *See Helton v. State*, 547 S.W.2d 564, 567 (Tenn. 1977), *overruled on other grounds by State v. Cabbage*, 571 S.W.2d 832 (Tenn. 1978). An admission is insufficient to support a conviction. *Id.* The Defendant has not explained how his statements qualify as mere admissions. In any event, the Defendant's statements were not the only evidence of his guilt.

-18-

The evidence is sufficient to support the conviction. The Defendant is not entitled to relief on this basis.

## II

The Defendant contends that the trial court erred in denying him representation by counsel of his choice. He argues that the right to the attorney of his choosing is inherent in his right to counsel and that the court should have granted defense counsel's motion to withdraw before the trial and allowed the substitution of another attorney who expressed interest in accepting the case.

The record reflects that the Defendant retained Michael Rohling before his arrest but was unable to complete payment of his attorney's fees after his September 2010 arrest. On October 6, 2010, the trial court appointed Mr. Rohling to represent the Defendant. On August 8, 2012, Mr. Rohling filed a motion to withdraw, noting that the Defendant had expressed dissatisfaction with his representation. At this point, the trial was scheduled for October 1, 2012.

The trial court conducted a hearing on the motion to withdraw on August 10, 2010. Mr. Rohling advised the court that he had received a letter from the Defendant approximately one week earlier and that the letter had been his first notification of the Defendant's desire for counsel to withdraw. He said he received the letter before the Defendant sent a second letter to the court. Mr. Rohling stated that he had represented the Defendant since the day after the homicide, which we note was almost two years earlier. The Defendant told the court that at one point, he had not seen Mr. Rohling for almost fifteen months despite being told almost weekly that counsel would visit him. He expressed his dissatisfaction with Mr. Rohling's ability to prepare for the trial because counsel had not provided him with DVDs, which he wanted to view in order to make notes and communicate with counsel about the trial. The district attorney stated that transcripts of the DVDs were being prepared and would be provided to the defense. The Defendant acknowledged that he had been present when the DVDs were recorded and that he viewed the DVDs in preparation for his codefendant's trial.[1] The Defendant expressed concern that Mr. Rohling was not zealously preparing a defense. He said that the issue had been ongoing and that "a multitude of times," he and Mr. Rohling had discussed "separation between" them. The court denied the motion, stating that the trial would proceed on October 1, 2012.

---

[1] The Defendant testified for the State at Mr. Cotham's trial. *See generally Coy J. Cotham, Jr.*, 2014 WL 3778613.

On September 18, 2012, Attorney Nicholas McGregor filed a notice stating that he had been contacted by the Defendant's family about retaining him to represent the Defendant. He stated that he was willing to accept the appointment and requested that the trial court "set this case on the docket a few weeks out for confirmation that [the Defendant] has either hired [him] or is unable to and will be continuing with his current counsel." The following day, the court heard a "Motion to Replace Counsel," although no written motion appears in the record. At the hearing, Mr. McGregor stated that he would not be prepared for a trial on October 1 and that he had never tried a first degree murder case. The court stated that Mr. McGregor was welcome to assist Mr. Rohling but that he could not assume the role of lead counsel. The court also stated its intent to proceed with the October 1 trial date and that the Defendant was not going to "derail the process."

Mr. Rohling represented the Defendant at the trial. David A. Collins represented the Defendant at the motion for a new trial. At the hearing on the motion for a new trial, the Defendant testified that he first spoke to Mr. Rohling about obtaining other counsel in the second half of 2011. He said he asked Mr. Rohling to file a motion to withdraw numerous times. He said he asked his family members to try to contact Mr. Rohling when he was unable to get a response from counsel. He said he was not present for the hearing at which Mr. McGregor spoke to the trial judge. He said he had been called to meet with Assistant District Attorney General Tom Thurman in Jaunaury 2012 but told Mr. Thurman he did not think he could speak to him because he had requested Mr. Rohling to file a motion to withdraw. The Defendant said "[I]t was just always downhill from then on." He said that although he was unable to hire another attorney, he thought his family would have. He said they never had a "full discussion" because counsel never filed a motion to withdraw. He acknowledged Mr. Rohling eventually filed the motion but stated he had been trying to "fire" Mr. Rohling for over a year before the motion was filed. The Defendant said he did not remember a conversation with his mother shortly before the trial in which he said he was satisfied with Mr. Rohling and thought God wanted him to go forward with Mr. Rohling. He said Mr. Rohling did not file motions promptly, refused to "pose things" he requested to the prosecutor, should have done a more thorough cross-examination of unidentified witnesses, could have called defense witnesses, and did not raise "[r]easonable doubt issues." He said that at first, Mr. Rohling had several ideas about the defense but that after a few months, "everything fell apart on his behalf." He said that four months before the trial, Mr. Rohling closed his office and did not notify him or his family members of his contact information. He said he called and wrote letters, but Mr. Rohling did not respond. The court asked if the defense was raising an ineffective assistance of counsel claim, and Mr. Collins stated that the issue was not being raised in the direct appeal.

The trial court granted the State's request to late file as an exhibit a recording of a telephone call between the Defendant and his mother. In it, the Defendant stated that he had been to court that day regarding his attorney. He said that he had prayed about the situation, that he asked God to give him the right attorney to get him home to his family, and that he had a productive conversation about the case with Mr. Rohling after the hearing. He said that the trial judge had not wanted to listen to him in court and that the judge thought he was trying to delay his October 1 trial. He expressed optimism about his trial. He said the hearing on the motion to withdraw had turned out as he expected.

A defendant in a criminal case has a constitutional right to counsel. U.S. Const. Amend. VI; Tenn. Const. Art. 1, § 9. In the case of a defendant represented by retained counsel, the constitutional right includes the right to counsel of the defendant's choosing. *See United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006). "The right of an accused to assistance of counsel, however, does not include the right to appointment of counsel of choice, or to special rapport, confidence, or even a meaningful relationship with appointed counsel." *State v. Carruthers*, 35 S.W.3d 516, 546 (Tenn. 2000); *see Morris v. Slappy*, 461 U.S. 1, 13-14 (1983). Our supreme court has said that the goal of the Sixth Amendment is to provide the accused with an effective advocate, not the counsel of his choice. *Carruthers*, 35 S.W.3d at 546.

Upon a showing of good cause, a trial court may grant an appointed attorney's motion to withdraw. T.C.A. § 40-14-205(a) (2012). A trial court's decision will not be disturbed on appeal unless an abuse of discretion is shown. *State v. Branam*, 855 S.W.2d 563, 566 (Tenn. 1993); *State v. Russell*, 10 S.W.3d 270, 274 (Tenn. Crim. App. 1999).

If the matter is presented as a motion for substitution of counsel, the defendant has the burden of establishing the existence of one or more of the following: (a) defense counsel's representation is "ineffective, inadequate, and falls below the range of competency expected of defense counsel in criminal prosecutions," (b) the defendant and defense counsel have an irreconcilable conflict, or (c) a complete communications breakdown exists between the defendant and defense counsel. *State v. Gilmore*, 823 S.W.2d 566, 568-69 (Tenn. Crim. App. 1991). Whether to grant the motion for substitution of counsel is a matter for the sound discretion of the trial court that will not be disturbed on appeal absent an abuse of discretion. *Id.* at 569. A request for substitution of counsel that involves a motion for a continuance requires the trial court to weigh and consider the "'competing interests of the trial judge's discretionary power to deny continuances and to control the court's calendar and the defendant's Sixth Amendment right to counsel.'" *Id.* (quoting *United States v. La Monte*, 684 F.2d 672, 673 (10th Cir. 1982)).

The record reflects that the trial court considered Mr. Rohling's motion to withdraw and later considered a motion to substitute counsel that, if granted, would have required a continuance. The Defendant was afforded the opportunity to express his concerns at the hearings on the motions to withdraw and for a new trial. He stated that he and counsel had engaged in ongoing discussions about counsel's withdrawing, but counsel told the court he first learned of the Defendant's concerns when he received a letter about a week before the hearing on the motion to withdraw. The Defendant expressed his concerns about not having the DVDs available to him, but the record reflects that he had been present when they were recorded and that he reviewed them previously. When the court advised him that transcripts were being prepared and would be made available to him, he said, "I can accept that. Thank you." In addressing the Defendant's concerns about counsel's trial preparation, the court noted that the evidence was known to the defense because of the codefendant's earlier trial. The court advised the Defendant that his disagreement with counsel about trial strategy was an insufficient reason to remove at "the 11th hour" an attorney who had been working on the case for well over a year. We note that at the hearings on the motions to withdraw and for a new trial, the Defendant provided general descriptions of his dissatisfaction with counsel's preparations but failed to articulate specific concerns the court could address.

The motion to substitute counsel was heard less than two weeks before the trial. Although Mr. McGregor was willing to take the case, he had not been retained by the Defendant or the Defendant's family and could not be ready on the trial date. Granting the motion would have necessitated a continuance, and the trial court expressed its concern that the case proceed to trial as scheduled.

Upon review, we conclude that the trial court did not abuse its discretion in denying the motions to withdraw and for substitution of counsel. Regarding the motion to withdraw, the record does not demonstrate good cause for allowing Mr. Rohling to withdraw less than two months before the trial. Regarding the motion for substitution of counsel, the record does not support a finding of any of the *Gilmore* factors, and the court allowed an intermediate remedy – participation of Mr. McGregor as "second chair" counsel – of which the Defendant chose not to avail himself. Regarding the Defendant's right to counsel under the state and federal constitutions, we note that the record does not support a conclusion that the court deprived him of an effective advocate. The Defendant is not entitled to relief.

The judgment of the trial court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE

-22-